UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:10-CR-21-FL

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| ROBERT LEON LECRAFT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the Court on the motion of Defendant Robert Leon Lecraft ("Defendant"), to suppress evidence seized and statements given subsequent to a police stop and search of a vehicle driven by Defendant. [DE-32.] The Government filed a response in opposition to the motion to suppress. [DE-34.] To further develop the record, the Court conducted an evidentiary hearing on September 20, 2010, at which the Government and Defendant with counsel appeared. This matter is now ripe for decision.

## STATEMENT OF THE CASE

On March 24, 2010, a Federal Grand Jury charged Defendant in a two count indictment. Count One charged that: "On or about August 7, 2009, in the Eastern District of North Carolina, the defendant, ROBERT LEON LECRAFT, having been previously convicted of a crime punishable by a term of imprisonment exceeding one (1) year, did knowingly possess in and affecting commerce, a firearm, to wit: a Kel-Tec, model P-32, .32 caliber pistol, in violation of Title 18, United States Code, Sections 922(g)1 and 924." Count Two charged that: "On or about August 7, 2009, ROBERT LEON LECRAFT, defendant herein, knowingly possessed a stolen firearm, that is, a Kel-Tec, model P-32, .32 caliber pistol, which had been shipped or transported

in interstate or foreign commerce before it was stolen, knowing and having reasonable cause to believe that the firearm was stolen, in violation of Title 18, United States Code, Section 922(j) and 924." [DE-1.]

Defendant moved to suppress all evidence seized and statements given based on the assertions that no valid consent to search was obtained and no *Miranda* warnings were given. [DE-32.] The Government contends that valid consent to search was in fact obtained and no *Miranda* warnings were necessary under the circumstances. [DE-34.]

## STATEMENT OF THE FACTS

Detective Marquie Morrison-Brown ("Detective Morrison-Brown"), Sergeant David Daniels ("Sergeant Daniels"), and Sergeant Harold Dombrowsky ("Sergeant Dombrowsky"), all law enforcement officers with the New Bern Police Department ("NBPD"), testified at the evidentiary hearing on September 20, 2010 regarding a traffic stop and search and related interrogation involving Defendant that took place on August 7, 2009; they were the sole witnesses. The Court finds the following facts based on their testimony.

### A. Testimony of Detective Morrison-Brown

Detective Morrison-Brown has been a law enforcement officer with the NBPD since 2004. Currently, she is a Detective with the Major Case Unit. However, previously, including at the time in question, she was an Officer assigned to the Street Crimes Unit.

Detective Morrison-Brown was on duty on the evening of August 7, 2009 and driving a white unmarked patrol car. At approximately 8:30 p.m., she observed a Chevy Avalanche run a stop sign while making a left from Grace Street onto East Rose Street in New Bern, North Carolina. After seeing the vehicle run the stop sign, she radioed the license plate number to NBPD Communications. Upon receiving a response, she activated her blue lights and attempted

to pull the vehicle over. The driver kept going, making a left onto Williams Street before eventually stopping. Detective Morrison-Brown pulled in behind the vehicle, gave her exact position over her radio, exited her patrol car, and approached the stopped vehicle from the passenger side. As she knocked on the window, she recognized the driver as Defendant, whom she was familiar with from a prior convenience store surveillance and gambling charge. There were no other occupants in the vehicle.

Detective Morrison-Brown explained to Defendant why he had been stopped and asked him for his driver's license and registration. He told her that he had run the stop sign because he was on his cell phone and not paying attention. Detective Morrison-Brown took his documents back to her patrol car, where she used her computer to pull up Defendant's information. At some point during this chain of events, Sergeant Daniels arrived on the scene as backup.[1] Detective Morrison-Brown discussed the traffic stop with Sergeant Daniels, who informed her that he was also familiar with Defendant from previous drug and/or gun offenses. Detective Morrison-Brown had not previously been familiar with this aspect of Defendant's criminal history.

Detective Morrison-Brown wrote out a warning citation and returned to Defendant's vehicle to hand it to him. She explained that she was only issuing a warning, and Defendant appeared quite pleased. In fact, Detective Morrison-Brown characterized her interaction with Defendant up until this point as quite pleasant, even friendly. After handing the citation along with his license and registration to Defendant, she asked him if he would mind if she searched for contraband.[2] This request for consent occurred approximately 3-5 minutes after the traffic

---

[1] It is NBPD standard operating procedure for a backup officer to respond to traffic stops at night in that area of town, due to its reputation for prevalent drug activity and violence. Detective Morrison-Brown testified that she remembers neither whether she called for backup or whether it was automatic nor at exactly what moment Sergeant Daniels arrived.

[2] Detective Morrison-Brown testified that she asked Defendant for consent to search both his person and vehicle, which would have been NBPD standard operating procedure. However, in her police report, she wrote only that she asked for consent to search his vehicle.

3

stop was originally initiated. Defendant responded, "Go ahead," so Detective Morrison-Brown asked Defendant to step out and proceed to the rear of his vehicle. He complied, but after reaching the rear of his vehicle, Defendant continued walking past where he had been asked to stop until he was on the passenger side of Detective Morrison-Brown's stopped patrol car. At this time, she informed Defendant that she was going to frisk his person for officer safety and asked if he had anything on him, to which he replied "I've got a gun." Sergeant Daniels, who by this time had walked over to Defendant's location, grabbed Defendant's hand and retrieved a firearm from his pocket. At that point, Detective Morrison-Brown handcuffed Defendant and placed him under arrest. A further search of Defendant's person revealed a magazine and associated rounds, which were seized, as well as a quantity of cash, which was not. A search of Defendant's vehicle revealed nothing relevant to the instant charges. Sergeant Daniels placed Defendant in his patrol car and transported him to the NBPD station. Detective Morrison-Brown remained behind and had no further involvement with Defendant or the booking process.

### B. Testimony of Sergeant Daniels

Sergeant Daniels has been a law enforcement officer with the NBPD since 1998. Currently, he is a Supervisor in the Street Crimes Unit with four people working under him. At the time in question, he held the same position and then-Officer Morrison Brown (now Detective Morrison-Brown) was one of his supervisees.

Sergeant Daniels was also on duty on the evening of August 7, 2009 and participated in the traffic stop of Defendant, responding to the scene in order to offer backup assistance. When he arrived, he drove past Detective Morrison-Brown's patrol car and Defendant's vehicle and parked facing the other direction a short distance up Williams Street. As he parked, he recognized the stopped vehicle as belonging to Defendant, with whom he was familiar from prior

4

law enforcement encounters and his general knowledge of residents in the community. Sergeant Daniels walked up to Detective Morrison-Brown's patrol car and spoke to her briefly; they discussed Defendant's criminal history and Detective Morrison-Brown informed him that she was going to issue a warning citation and ask for consent to search.

Sergeant Daniels stood between the two vehicles and watched as Detective Morrison-Brown approached Defendant's vehicle, handed him the warning citation along with his license and registration, and had a brief conversation. Sergeant Daniels then watched as Defendant got out of his vehicle and walked back towards Detective Morrison-Brown's stopped patrol car. Sergeant Daniels noticed that Defendant was walking significantly faster than normal and, in response, moved to keep a view of him and advised Detective Morrison-Brown to quickly follow behind.[3] He heard Defendant admit to Detective Morrison-Brown that he had a firearm, so he reached into Defendant's pocket to secure it. He took the weapon into custody, as well as an additional magazine which fit the firearm, before Defendant was placed under arrest. Subsequently, Sergeant Daniels transported Defendant to the station. They engaged in conversation but Sergeant Daniels did not ask any questions of Defendant; therefore, no *Miranda* warnings were given.

Upon arriving at the station, Sergeant Daniels explained Project Safe Neighborhoods, a federal firearms initiative, to Defendant. Defendant said that he had information that might be helpful but wanted to speak to a Sergeant Dombrowsky, another law enforcement officer with whom he had a prior relationship. Sergeant Daniels arranged for Sergeant Dombrowsky to come and talk to Defendant, and then watched the conversation between them from an observation area in a side office with monitoring screens.

---

[3] Sergeant Daniels was familiar with Defendant's gait due to his numerous prior interactions with him, which he quantified as "way over ten times." In addition, Sergeant Daniels was aware of Defendant's age of 65 at the time and the speed at which a person of such an age might generally walk.

5

### C. Testimony of Sergeant Dombrowsky

Sergeant Dombrowsky has been a law enforcement officer with the NBPD for over 20 years. Currently, he is assigned to the Major Case Unit. There, he supervises seven detectives as well as carries his own caseload of primarily homicide investigations.

Sergeant Dombrowsky was *not* on duty on the evening of August 7, 2009; rather, he was at home. At approximately 9:00 p.m., he received a call from Sergeant Daniels at the station informing him that Defendant had been arrested and wished to speak with him. Sergeant Dombrowsky was very familiar with Defendant, having encountered him on and off for almost his entire 20-year tenure at the NBPD. Defendant had provided information to him in the past regarding the locations of people and evidence, which had always been reliable and credible. In fact, he had been such a frequent and valued informer that he and Sergeant Dombrowsky had one another's cell phone numbers. Out of respect for this prior assistance, Sergeant Dombrowsky dressed in plain clothes and came to the station in response to Defendant's request, despite the fact that he was not formally on duty at the time.

Upon arriving at the station, Sergeant Dombrowsky entered the interview room in which Defendant was waiting. Defendant indicated to him that he was "looking for some assistance," which Sergeant Dombrowsky understood to be based on their prior officer-informer relationship. Sergeant Dombrowsky informed Defendant that he was not there to speak to him about the events of that evening which had resulted in Defendant's arrest. Instead, Sergeant Dombrowsky indicated that he would like to discuss a homicide investigation involving Defendant's son about which they had previously had some discussions. As a result, no *Miranda* warnings were given to Defendant by Sergeant Dombrowsky.

At some point during the conversation, Sergeant Dombrowsky told Defendant that he was "getting old and should stop messing around," apparently in reference to that evening's events.[4] In turn, Defendant told him that he had "only had the gun for protection because he had been robbed in the past." Sergeant Dombrowsky did not follow up with any questions about Defendant's pending charges. The entire conversation between Sergeant Dombrowsky and Defendant lasted no more than 30 minutes.

## FRAMEWORK FOR ANALYSIS

### A. Fourth Amendment Analysis

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. The temporary detention of an individual during a vehicle stop constitutes a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Thus, a vehicle stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). However, as a general rule, a vehicle stop is reasonable when a law enforcement officer has probable cause to believe that a traffic violation has occurred. *Id.* During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). However, any further detention is illegal unless the officer has a reasonable suspicion of other criminal activity or the individual consents to the further detention. *Id.*

Searches of vehicles conducted without a warrant will be found to be unreasonable unless a valid exception to the warrant requirement is applicable. *Schneckcloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A search conducted pursuant to valid consent is a well-recognized form of just such an exception. *Id.* If the validity of consent is challenged, the court must determine whether

---

[4] Sergeant Dombrowsky testified that he intended this comment as general "friendly advice."

the consent was knowing and voluntary based upon the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). The Government must prove that the consent was voluntary by a preponderance of the evidence. *Id.* In considering the totality of the circumstances, it is appropriate to take into account "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). However, the Government need not prove that the accused knew he could refuse consent in order to prove voluntariness. *Id.* Similarly, nor are officers required to tell an individual that he has the right to refuse consent. *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996).

### B. Fifth Amendment Analysis

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect that right, when a suspect is subject to "custodial interrogation," he must be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court has stated that an individual is in custody for *Miranda* purposes if his freedom of action is "curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). The Supreme Court has defined "interrogation" for *Miranda* purposes as "either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993). Statements that are not the product of express questioning or its functional equivalent but rather are *volunteered* by a suspect while in custody are *not* barred by the Fifth

8

Amendment. *Id.* The term "functional equivalent" has been narrowly construed both by the Supreme Court and the Fourth Circuit since *Innis*, resulting in only very limited circumstances where statements will be suppressed. *United States v. Kimbrough*, 477 F.3d 144, 147-50 (4th Cir. 2007). For example, statements of officers about evidence in their possession which are not designed to elicit an incriminating response are not interrogation for Miranda purposes. *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992); *see also United States v. Blake*, 571 F.3d 331 (4th Cir. 2009) (police officer who taunted a juvenile who had invoked his right to counsel by showing him a charging document with "DEATH" as a possible sentence and then said "I bet you want to talk now" did not engage in the functional equivalent of interrogation).

## DISCUSSION

Defendant first argues that no valid consent to search was obtained in violation of his Fourth Amendment rights. Defendant next argues that he was not properly apprised of his *Miranda* rights under the Fifth Amendment. As a result, Defendant contends that both all physical evidence seized and any statements he made to Sergeant Dombrowsky should be suppressed. The Court disagrees.

### A. Suppression of physical evidence

Defendant does not seriously contest the lawfulness of the initial stop of his vehicle, conceding that Detective Morrison-Brown observed him run a stop sign and initiated a valid traffic stop. However, Defendant does argue that this initially valid stop became unlawful when it was prolonged beyond the time necessary to issue a warning citation. In addition, Defendant argues that any consent to search that he gave was invalid. The Government contends that, under the totality of the circumstances, Defendant did in fact give knowing and voluntary consent to search to Detective Morrison-Brown.

The Court finds Defendant's first argument—that the vehicle stop was unlawfully prolonged—to be without merit. Extending the timeframe of a routine traffic stop by virtue of asking for and receiving consent to search does not run afoul of the Fourth Amendment. *See Foreman*, 369 F.3d at 781. Defendant's reliance on *Illinois v. Caballes*, 543 U.S. 405 (2005) for the proposition that prolonging a stop beyond the time required to issue a citation runs afoul of the Fourth Amendment is misplaced. In *Caballes*, the driver *refused* when asked for consent to search, yet the dog-sniff search that ensued instead was still held to be constitutional. Nothing in *Caballes* indicated that prolonging a stop by asking for and receiving consent would require a different result. Here, Detective Morrison-Brown promptly requested consent to search upon issuing the warning citation; there was no delay to speak of.

The Court finds Defendant's second argument—that no valid consent to search was given—similarly unpersuasive. Rather, the Court finds that the facts of this case clearly indicate that Defendant gave knowing and voluntary consent to search. Under the totality of the circumstances, both the characteristics of the accused and the conditions under which consent was given weigh in favor of the validity of consent. Defendant's age, intelligence, and experience with the criminal justice system (both as a former criminal defendant and as a cooperator), as well as the short duration of the stop and its overall pleasant nature contribute to this conclusion. *See Mendenhall*, 446 U.S. at 557; *Lattimore*, 87 F.3d at 650. The Court finds that the Government has met its burden, showing by a preponderance of the evidence that, under the totality of the circumstances, Defendant's consent was knowing and voluntary.[5]

---

[5] Defendant also appears to argue that because Detective Morrison-Brown knew from relatively early on in the encounter that she was going to ask for consent to search, her actions and Defendant's subsequent consent are somehow unconstitutional. However, it is well-settled that an officer's subjective motives are irrelevant to a proper Fourth Amendment analysis. *Whren*, 517 U.S. at 813-14. Even if Detective Morrison-Brown intentionally delayed notifying Defendant of an impending search, that would not render his consent invalid.

In addition, Defendant argues that even if he did give valid consent to search, he only consented to a search of his vehicle and not also a search of his person. The only evidence offered to support this proposition was the fact that Detective Morrison-Brown's police report mentioned only her receipt of consent to search his vehicle. However, Detective Morrison-Brown testified that her notes were not necessarily a reflection of the exact extent of consent, but merely constituted a general note of the fact that she had received consent, as well as that she would have asked for consent to search both a person and a vehicle as part of such a routine traffic stop. Sergeant Daniels also testified that it would have been routine NBPD procedure to ask for consent to search both a person and a vehicle. As a result, the Court is convinced that consent was requested and subsequently given to search both Defendant's person and his vehicle. Furthermore, the Court notes that, even accepting Defendant's argument that no consent to search Defendant's person was given, nothing would have prevented Detective Morrison-Brown from asking Defendant to leave his vehicle incident to the traffic stop. *Robinette*, 519 U.S. at 38-39 (holding that once a vehicle has been lawfully detained, even if only for a minor traffic violation, the officer may order the driver to exit the vehicle without violating the Fourth Amendment). At that point, Detective Morrison-Brown was clearly entitled to frisk Defendant's person for officer safety under *Terry v. Ohio*, 392 U.S. 1 (1968). In fact, she informed him that she was going to need to frisk him for exactly that reason, and that was the point at which he admitted to possession of the firearm.

Finally, the Court notes that Defendant's reliance on *United States v. Espinoza*, 490 F.3d 41, 48 (1st Cir. 2007) is misplaced. *Espinoza* does not hold, as Defendant seems to argue, that an accused who is constrained in his vehicle may not give valid consent to search because he does not feel free to leave. Rather, *Espinoza* holds that a driver so constrained in his vehicle is

11

Case 4:10-cr-00021-FL   Document 39   Filed 10/07/10   Page 11 of 14

seized within the meaning of the Fourth Amendment and therefore may not be detained without reasonable suspicion. Here, the issue of reasonable suspicion need not be reached because Defendant was validly seized as part of a routine traffic stop.[6] Accordingly, whether Defendant felt free to leave or not is not at issue. *See also United States v. Smith*, 30 F.3d 568 (4th Cir. 1994) (holding that driver's belief that any objection to search could have triggered a confrontation did not negate consent). Accordingly, the Court finds that valid consent to search was given.

### B. Suppression of Defendant's statement to Sergeant Dombrowsky

At the outset, the Court notes that, because it finds that valid consent to search was given, anything Defendant might have subsequently said about his possession of the firearm has no practical significance. Once the Government had valid evidence of Defendant's possession of the firearm, the possession elements of the charges in the indictment will be met with or without his statement. However, for purposes of completeness, the Court will address Defendant's Fifth Amendment argument in full.

Defendant argues that he was subjected to custodial interrogation by Sergeant Dombrowsky without being given *Miranda* warnings in violation of his Fifth Amendment rights.[7] The Government concedes that Defendant was in custody for *Miranda* purposes, but contends that he was not subject to interrogation and that thus, no *Miranda* warnings were necessary and any statements he made were voluntarily given.

---

[6] However, the Court does note that Defendant's refusal to immediately pull over, his quicker than normal gait, and the fact that he did not stop where told when asked out of the car all would likely contribute to a finding of reasonable suspicion, were it necessary.

[7] To the extent Defendant argues he should have been given *Miranda* warnings even earlier—specifically during the traffic stop and search—the Court notes that *Miranda* warnings are not required during a routine vehicle stop. *United States v. Sullivan*, 138 F.3d 126, 130-32 (4th Cir. 1998). Similarly, though the presence or absence of *Miranda* warnings is a factor to consider in assessing whether consent is given voluntarily, they are not *required* when asking for consent to search. *United States v. Elie*, 111 F.3d 1135, 1146 (4th Cir. 1997), *abrogated on other grounds by United States v. Sterling*, 283 F.3d 216 (4th Cir. 2002).

12

The Court finds that Defendant's argument—that he was subject to interrogation by Sergeant Dombrowsky—must fail. Though Defendant was in custody, it is well-settled that statements which are not the product of custodial *interrogation*—express questioning or its functional equivalent—but rather volunteered by a suspect, pose no Fifth Amendment concern. *Innis*, 466 U.S. at 300-01. It is clear that Sergeant Dombrowsky did not actually "expressly question" Defendant at the station on August 7, 2009. In fact, he explicitly told Defendant that he was *not* there to talk to him about that evening's events. Therefore, the Court assumes that Defendant is arguing that Sergeant Dombrowsky's conduct constitutes the "functional equivalent" of interrogation.

The only thing that Sergeant Dombrowsky said that could be construed as the functional equivalent of express questioning was his comment that Defendant was "getting old and should stop messing around," to which Defendant volunteered that he "only had the gun for protection because he had been robbed in the past." The Court does not find that this rises to the level of the functional equivalent of express questioning. Particularly instructive in light of this case's facts is the Fourth Circuit's decision in *Payne*, 954 F.2d 199. In *Payne*, a police officer told a suspect that, "They found a gun at your house," to which the suspect responded "I just had it for my protection." *Id.* at 201. The court in *Payne* found the officer's statement to be "rather innocuous." *Id.* at 203. Here, Sergeant Dombrowsky's commentary was significantly less related to the Defendant's pending charges than that in *Payne*, yet elicited the same response. In addition, the Court notes that Sergeant Dombrowsky's conduct comes nowhere close to the glaring nature of the officer's conduct in *Blake*, 571 F.3d 331. In *Blake*, showing a juvenile a charging document with "DEATH" written on it and then taunting him did not rise to the level of the functional equivalent of interrogation. Clearly, the bar is high, and Defendant has presented

13

no evidence that it has been cleared in this instance. Sergeant Dombrowsky and Defendant had a long-standing relationship, so much so that they had each other's cell phone numbers, and Sergeant Dombrowsky was clear that he did not wish to talk about Defendant's current predicament, but only the prior homicide investigation. The Court is inclined to agree with Sergeant Dombrowsky's characterization of his comment as "friendly advice." Accordingly, the Court finds that there was no interrogation and thus no requirement that Defendant be apprised of his *Miranda* rights.

As a result of the foregoing discussion, the Court recommends that Defendant's Motion to Suppress be denied.

## CONCLUSION

The Court **RECOMMENDS** that Defendant's Motion to Suppress [DE-32] be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 7th day of October, 2010.

DAVID W. DANIEL
United States Magistrate Judge